UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                          :
ELIZABETH SILVER,                                         :
                                                          :        08 Civ. 06522 (JSR) (DF)
                                  Plaintiff,              :
                                                          :
                   -against-                              :        **REPORT AND**
                                                          :        **RECOMMENDATION**
MARIO LAVANDEIRA, Jr., a/k/a MARIO                        :
LAVANDEIRA, a/k/a PEREZ HILTON, COOL LAVA                 :
ENTERTAINMENT, INC., HENRY COPELAND,                      :
PRESSFLEX LLC, and BLOGADS LLC,                           :
                                                          :
                                  Defendants.             :
-----------------------------------------------------------------------X

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**

Plaintiff Elizabeth Silver ("Silver" or "Plaintiff") has brought the above-captioned action

against defendants Mario Hermando Lavandeira ("Lavandeira"), Cool Lava Entertainment Inc.

("Cool Lava"), Henry Copeland ("Copeland"), Pressflex LLC ("Pressflex"), and Blogads LLC

("Blogads") (collectively, "Defendants"). Against defendants Lavandeira and Cool Lava,

Plaintiff asserts claims for misappropriation of "hot news," copyright infringement, removal or

alteration of copyright management information, false designation of origin, and unfair

competition. (*See* Second Amended Complaint, dated Nov. 21, 2008 ("2d Am. Compl.")

(Dkt. 54), at ¶¶ 111-41, 151-68.) Against all Defendants, Plaintiff asserts claims for restraint of

trade, negligence, harassment, and tortious interference with business. (*See* 2d Am. Compl., at

¶¶ 142-50, 169-77.) Currently before the Court are Plaintiff's motion to dismiss her action

voluntarily without prejudice (*see* Motion for Voluntary Dismissal Without Prejudice Pursuant

to Federal Rule of Civil Procedure 42(a)(2), dated Mar. 3, 2009 ("Pl. Mtn.") (Dkt. 82)), and

Defendants' motion to dismiss the Second Amended Complaint or for summary judgment (*see*

Motion to Dismiss or Alternatively for Summary Judgment, dated Jan. 9, 2009 ("Def. Mtn.") (Dkt. 66)).

For the reasons discussed below, I recommend that Plaintiff's motion for voluntary dismissal be denied and that Defendant's motion to dismiss (to which Plaintiff has not filed a timely response) be granted.

## BACKGROUND

### A.    Factual Background

Based on the allegations of Plaintiff's Second Amended Complaint, Plaintiff is engaged in the business of entertainment industry news, marketing and public relations. (*See* 2d Am. Compl., at ¶ 2.) Since June, 2008, Plaintiff has operated a celebrity news website called perezrevenge.com. (*See id*., at ¶¶ 21, 23.) Lavandeira, who is also engaged in the celebrity news business, operates a website called perezhilton.com, which he created in 2005. (*See id*., at ¶¶ 46, 83, 101.) Defendant Cool Lava is a California corporation, which Plaintiff alleges is "owned, operated, controlled and/or is the alter ego of Defendant Lavandeira." (*See id*., at ¶ 6.) Throughout her papers, Plaintiff refers to Lavandeira and Cool Lava collectively, as "Defendant Lavandeira/Lava." (*See, e.g.*, *id*., at ¶ 26.) Defendant Copeland is the owner of defendants Blogads, a seller of blog advertising, and Pressflex, a web publisher and consultant. (*See id*., at ¶¶ 7-13.) For the most part, Plaintiff does not plead individualized allegations as to the conduct of defendants Copeland, Pressflex, and Blogads, but instead collectively refers to them as "Copeland/Pressflex/Blogads." (*See id*., at ¶ 14.)

Plaintiff alleges that she contacted Copeland in June, 2008, seeking "to enter into a marketing/advertising agreement with . . . Copeland/Pressflex/Blogads," but that

Copeland/Pressflex/Blogads declined to do business with her.  (*See id*., at ¶ 44.)  This conduct forms the basis of Plaintiff's antitrust claims.  (*See id*., at ¶¶ 142-50.)  After being contacted by Plaintiff, Copeland allegedly alerted Lavandeira to the existence of Plaintiff's website (*see id*., at ¶ 45), prompting Lavandeira to send a letter to Plaintiff, demanding that she transfer her website to him (*see id*., at ¶ 47).  Plaintiff continued to operate her website, and Lavandeira filed a lawsuit against her in California.  *See Lavandeira v. Infuse, LLC*, No. CV 08-4794 (GAF), slip op. at 1-2 (C.D. Cal. Apr. 28, 2009).  Plaintiff alleges that Lavandeira's California lawsuit is frivolous and designed to harass and embarrass her (*see id*., at ¶¶ 51-53), and that Defendants have further harassed her with threatening letters, phone calls, and emails (*see id*., at ¶¶ 51-53, 169-77).  In addition, Plaintiff claims that Lavandeira steals, copies, and misappropriates copyrighted materials from her website, removes Plaintiff's name from the materials, and intentionally tries to mislead the public into believing the works are his.  (*See id*., at ¶¶ 55-78, 95-101, 111-41.)

### B.   Procedural Background

#### 1.   The California Action

As noted above, the first legal skirmish between the parties to this action was in the Central District of California, where, on July 21, 2008, Lavandeira filed a federal action against Silver, Silver's partner, Margaret Rogers ("Rogers"), and Silver's company, Infuse, LLC ("Infuse"), for trademark dilution, false designation of origin, unfair competition, and violation of the Anti-Cyber Squatting Consumer Protection Act.  *See Lavandeira v. Infuse, LLC*, No. CV 08-4794 (GAF), slip op. at 1-2 (C.D. Cal. Apr. 28, 2009).  Apparently, Silver vigorously

3

disputed that she was subject to the jurisdiction in California and decided to commence an action against Lavandeira in this Court.

### 2.     The Instant Action ("Case I" in this Court), and Silver's Motion for a Preliminary Injunction

On July 22, 2008, immediately after being sued by Lavandeira in California, Silver commenced the instant action against Lavandeira in this Court ("Case I") (*see* Complaint, dated July 22, 2008 ("Compl.") (Dkt. 1)), alleging First Amendment violations, unfair competition, deceptive trade practices, and tortious interference with business.  (*Id.*)

On September 8, 2008, Lavandeira filed a motion to dismiss Silver's Complaint. (Dkt. 14.)  Silver opposed that motion on September 30, 2008 (Dkt. 23), and Lavandeira filed a reply on October 30, 2008 (Dkt. 32).  On the same day as Lavandeira filed his reply, however, Silver filed an Amended Complaint.  (Dkt. 34.)  As a result, and following a conference before this Court, Lavandeira withdrew, as moot, his motion to dismiss the original Complaint.  (*See* Declaration of Jeffrey Eilender, dated Mar. 27, 2009 ("5/27/09 Eilender Decl."), Ex. 8, at 6.) Further, because Silver's Amended Complaint lacked clarity as to which of her initial claims she wished to continue to pursue, the Court instructed Silver to file a Second Amended Complaint, clarifying her claims.  (*See id.* at 23-28.)

Silver filed her Second Amended Complaint on November 21, 2008.  (Dkt. 54.)[1]  Silver's Second Amended Complaint differed from the original Complaint in that she added claims for misappropriation of "hot news," negligence, copyright infringement, violation of the Digital Millennium Copyright Act (the "DMCA"), violation of the Lanham Act, and antitrust violations

---

[1] This pleading was entitled "First Amended Complaint," but, as it was in fact the second amended pleading filed by Silver, this Court deemed it the "Second Amended Complaint."

(*see generally* 2d Am. Compl.), and omitted her First Amendment claim and her claim under the New York General Business law (*id*.).  In addition, the Second Amended Complaint added defendants Cool Lava, Copeland, Pressflex, and Blogads.  (*Id*.)

On December 1, 2008, Silver moved for a preliminary injunction in this action (Dkt. 41), to enjoin the alleged conduct of Defendants that purportedly formed the basis of her Second Amended Complaint.  On December 17, 2008, Defendants moved for an order requiring that Silver post a bond as security for their anticipated attorney's fees and costs (Dkt. 48), and, on December 23, 2008, they filed an opposition to Silver's preliminary injunction motion (Dkt. 57).

> ### 3.    Lavandeira's Withdrawal of Certain Claims in the California Case, and Commencement of <u>Suit Against Silver Here ("Case II" in this Court)</u>

On December 1, 2008, the same day that Silver moved for a preliminary injunction in this Court, Lavandeira voluntarily withdrew the California Action as against Silver and Rogers, and moved for default as against Infuse (which had apparently never appeared in the case through counsel, as required for a corporate entity).  (*See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Voluntary Dismissal of the Action Without Prejudice, dated Mar. 27, 2009 ("Def. Opp.") (Dkt. 84), at 4.)

Then, on December 23, 2008, Lavandeira commenced an action in this Court ("Case II") against Silver, Rogers, and Infuse, alleging the same claims as he had alleged in the California Action, in addition to claims for copyright infringement and violation of the DMCA.  (*See* Complaint, dated Dec. 23, 2008, filed as Dkt. 1, in *Lavandeira v. Infuse, LLC*, No. 08 Civ. 11213 (S.D.N.Y.).)  Silver, for her part, asserted counterclaims in Case II, including counterclaims for abuse of process, tortious interference, fraud, and negligence.  (*See* Answer, Affirmative

Defenses and Counterclaims, undated, filed on Jan. 12, 2009, as Dkt. 10, in *Lavandeira v. Infuse,*

*LLC*, No. 08 Civ. 11213.)[2]

### 4.   This Court's January 7, 2009 Recommendation that Silver's Motion for a Preliminary Injunction in Case I Be Denied

On January 7, 2009, this Court denied without prejudice Defendants' motion for the

posting of a bond in Case I (Dkt. 63), and issued a Report and Recommendation, familiarity with

which is assumed, recommending that Silver's motion for a preliminary injunction be denied

(Dkt. 61).  Among other things, this Court reasoned that Silver's claims, as pleaded in her

Second Amended Complaint, were unlikely to succeed on the merits.  (*See id.*)

Judge Rakoff extended to February 10, 2009, Silver's time for filing objections to this

Court's Report and Recommendation, but informed Silver, in a telephone conference, that no

further extensions to that deadline would be granted.  (*See* Order, dated Feb. 25, 2009 ("2/25/09

Order") (citing a Jan. 21, 2009 conference).)

### 5.   Lavandeira's Motion To Dismiss Silver's Second Amended Complaint, Silver's Failure To File a Timely Opposition, and the Court's Denial of Silver's Requested Preliminary Injunction

On January 9, 2009, Lavandeira (having previously moved to dismiss Silver's initial

Complaint in Case I, but, as noted above, having withdrawn that motion when Silver amended

her pleading), together with the new Defendants in Case I, filed a motion to dismiss the Second

---

[2] A number of motions have been filed in Case II, including a motion by Lavandeira to dismiss Silver's counterclaims as duplicative of her claims in Case I and as insufficient to state a claim (Dkt. 15 in Case II), and a motion by Silver either to dismiss Lavandeira's claims for lack of subject matter jurisdiction, failure to state a claim, or failure to join an indispensable party, or, alternatively, for summary judgment.  (Dkt. 29 in Case II).  For the most part, these motions are not relevant to the motions in Case I that are the subject of this Report and Recommendation.

Amended Complaint, or, alternatively, for summary judgment in their favor on Silver's claims. (Dkt. 66.)  That motion is currently before Court.

Silver's opposition to the motion was originally due on February 9, 2009, but she did not submit any opposition by that date.  Rather, on February 10, Silver filed a motion for an extension of both her time to oppose Defendants' motion and to file objections to this Court's January 7 Report and Recommendation.  (Dkt. 79.)  Then, on the following day, February 11, 2009, Silver requested permission to withdraw and re-file her injunction motion, based on newly obtained copyright registration certificates.  (*See* Letter to the Court from Elizabeth Silver, dated Feb. 11, 2009.)  By Order dated February 25, 2009, Judge Rakoff denied Silver's request for additional time to object to the Report and Recommendation, and adopted this Court's Report and Recommendation in full, thereby denying Silver's motion for a preliminary injunction.  (*See* 2/25/09 Order, at 2.)

As to Defendants' pending motion to dismiss Silver's claims in Case I, Silver represented to this Court at a February 24, 2009 conference that, despite her failure to file a timely opposition to that motion, she nonetheless wished to oppose it.  (*See* transcript of conference before the Court on Feb. 24, 2009 ("2/24/09 Tr."), at 9.)  So as to ensure that Silver would have a fair opportunity to file her opposition, this Court extended her deadline for filing opposition papers to March 3, 2009.  (*Id.*, at 11.)  Silver, however, did not file any opposition papers by that date.

### 6.    Silver's Motion for Voluntary Dismissal of Case I

On March 3, 2009, instead of filing an opposition to Defendants' motion to dismiss her claims in Case I, Silver moved for leave to withdraw that action voluntarily without prejudice.

(Dkt. 82.)  Defendants opposed the motion on March 27, 2009 (Dkt. 84), and Silver did not file a

Reply, despite being granted an extension of time to do so (Dkt. 85).

**7.    The Court's April 21, 2009 Case Management Conference**

On April 21, 2009, this Court held a conference with all parties, at which time the Court

raised the status of both Defendants' motion to dismiss the Second Amended Complaint in

Case I and Plaintiff's motion for voluntary dismissal.  At that conference, Plaintiff represented to

the Court that she had filed a reply on her motion for voluntary dismissal of the action (*see*

transcript of conference before the Court on Apr. 21, 2009 ("4/21/09 Tr."), at 3), although the

Docket does not reflect that any such reply was, in fact, filed.  Plaintiff also represented to the

Court that she had filed an opposition to Defendants' motion to dismiss her Second Amended

Complaint (*see id.* at 4), although it became apparent that, to the extent Plaintiff had done so, her

opposition had been filed more than a month past the already-extended deadline for that filing,

and she had neither sought nor received leave of Court to make an untimely filing.[3]

At the conference, the Court informed Plaintiff that, while it would not consider her

belated opposition to Defendants' motion, it would also not recommend that the motion to

dismiss be granted on default.  Rather, the Court informed Plaintiff that, especially given her

---

[3] The submission to which Plaintiff pointed, as constituting her opposition to Defendants'
motion to dismiss, was dated April 17, 2009, and was entitled "Motion for Order (1) Denying
Defendants' Motions for Summary Judgment and Costs and/or Granting Discovery in Relation
To Opposition To Motion for Summary Judgment; (2) Permit Filing Under Seal of Certain
Information (Including Client Lists, News Sources, Celebrity Sources, Marketing &
Development Information) in Relation To This Case and the Related Case of Lavandeira v.
Infuse LLC el al 08-cv-11213(JSR)(DCF); (3) for Relief Pursuant to FRCP Rule 60(b) from
Court's February 28, 2009 Order Based on January 7, 2009 Report and Recommendation;
(4) and for Other Just and Equitable Relief."  (Dkt. 87.)

*pro se* status, it would consider the merits of Defendants' stated positions.  (4/21/09 Tr., at 12-13, 19.)

### 8.   The California Court's Issuance of a Default Judgment Against Infuse

On April 28, 2009, the federal court in California granted Lavandeira's motion for a default judgment against Infuse.  *Lavandeira v. Infuse, LLC*, No. CV 08-4794 (GAF), slip op. at 3 (C.D. Cal. Apr. 28, 2009).  The California court also granted a permanent injunction enjoining Infuse and its officers, agents, employees, attorneys, successors and assigns from, *inter alia*, using any of Lavandeira's marks, including the term "Perez" and the domain name "perezrevenge.com," "to designate any platform, medium, and/or website that contains entertainment and celebrity news and gossip," and ordering Infuse to transfer the ownership of the "perezrevenge.com" domain name to Lavandeira.  *Id.* at 14-15.  On May 6, 2009, judgment was entered against Infuse.  *Lavandeira v. Infuse, LLC*, No. CV 08-4794 (GAF), slip op. at 3 (C.D. Cal. May 6, 2009).[4]

### DISCUSSION

## I.   PLAINTIFF'S VOLUNTARY DISMISSAL MOTION

### A.   Applicable Legal Standards

Rule 41(a)(1) of the Federal Rules of Civil Procedure provides that a plaintiff "may dismiss an action without a court order by filing:  (i) a notice of dismissal *before the opposing*

---

[4] In light of the California judgment, Lavandeira has now opposed Silver's motion to dismiss Case II by arguing, *inter alia,* that Silver is barred by *res judicata* from raising any defenses or arguments that are inconsistent with the findings of the U.S. District Court in California.  (*See* Dkt. 35 in Case II.)  Silver, for her part, has represented to the Court that she intends to seek to vacate the California judgment.  (*See* Letter to the Court from Elizabeth Silver, dated July 2, 2009, at 1.)

*party serves either an answer or a motion for summary judgment*; or (ii) a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1) (emphasis added). In this case, Rule 41(a)(1) is inapplicable, as Lavandeira had already served a summary judgment motion prior to Silver's service of her notice of voluntary dismissal (*see* Dkt. 81), and as Lavandeira has not stipulated to dismissal. Accordingly, the relevant standard is supplied by Rule 41(a)(2), which provides that, except as provided in Rule 41(a)(1), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

"Voluntary dismissal pursuant to Rule 41(a)(2) is not a matter of right. It may be granted only if defendants will not be unduly prejudiced, and then only on terms and conditions that protect defendants from any unfairness." *Ames v. Clifford*, No. 94 Civ. 6712 (JSM), 1996 U.S. Dist. LEXIS 14565, at *2 (S.D.N.Y. Oct. 2, 1996). In determining whether to grant a plaintiff's motion for voluntary dismissal under Rule 41(a)(2), courts consider the following factors: (1) the plaintiff's diligence in bringing the motion; (2) any "undue vexatiousness" on the plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of the plaintiff's explanation for the need to dismiss. *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990).

### B.   Plaintiff's Motion

Silver brought her motion for voluntary dismissal based on the purported grounds that voluntary dismissal would "simplify these proceedings, reduce the burden on the Court and the cost to all parties and [because Silver does] not really care if [she is] a Plaintiff or a

Defendant/Counterclaimant, as long as all claims, defenses and issues are heard on the merits."
(Pl. Mtn., at ¶ 5.)  Lavandeira argues, however, that he would be unfairly prejudiced by
voluntary dismissal of Silver's claims, in light of the costs that he has already incurred in
litigating the case up to this point and in preparing his dismissal motions.  (*Id.*, at 9-16.)  In
particular, Lavandeira argues that a voluntary dismissal without prejudice would be improper
because he is entitled to a dismissal *with* prejudice as a result of Silver's default on his motion
and based on the lack of merit of Silver's claims.  (Def. Opp., at 8.)

Although Silver purports to bring her motion for voluntary dismissal pursuant to
Rule 42(a)(2) of the Federal Rules of Civil Procedure (*see* Dkt. 82), that rule is inapplicable, as it
relates to the consolidation of actions.  The Court will thus construe Silver's motion as having
been brought pursuant to Rule 41(a)(2), and will consider the motion in light of the relevant
factors set out in *Zagano,* as cited above.  Applying these factors, this Court finds that
Lavandeira would be unduly prejudiced if the Court were to grant Silver's motion for voluntary
dismissal.

### 1.    Diligence in Bringing the Motion

Eight months passed between the filing of Silver's initial Complaint, in July 2008, and
the filing of her motion for voluntary dismissal.  In the interim, Lavandeira filed a motion to
dismiss the initial Complaint, which Silver amended on the same date that Lavandeira's reply
was due, mooting Lavandeira's motion at the last moment.  With advance notice to Silver,
Lavandeira then filed a revised motion, directed to Silver's amended pleading.  Only after
Lavandeira had incurred the cost of rewriting his motion, did Silver finally seek to withdraw her

claims.  Under the circumstances, it cannot be said that Silver acted with "diligence' in bringing her motion for voluntary dismissal, and this factor weighs in Lavandeira's favor.

### 2.  Undue Vexatiousness

Lavandeira argues that Silver's conduct to date demonstrates undue vexatiousness. Indeed, the Court questions Silver's decision to amend her initial Complaint on the day Lavandiera's reply was due, without any prior indication of her intentions.  The Court is also troubled by Silver's representation to this Court at the February 24 conference that she wished to file an opposition to Lavandeira's motion to dismiss, leading the Court to grant her an extension to do so, when – on the last date, as extended, for filing such opposition – she instead moved for voluntary dismissal.  As even Lavandeira points out, however, a finding of "undue vexatiousness" requires concrete evidence of "ill-motive."  (Def. Opp., at 10 (citing *Jewelers Vigilance Comm. v. Vitale Inc.*, No. 90 Civ. 1476 (MJL), 1997 U.S. Dist. LEXIS 14386, at *7-8 (S.D.N.Y. Sept. 12, 1997).)  Silver's litigation tactics, although aggressive and perhaps misguided, do not concretely demonstrate "ill motive."  Silver's conduct, while questionable, could also be explained by Silver's lack of litigation experience, and thus the Court finds that this factor does not weigh strongly in favor of either side.  *See Jewelers Vigilance Comm.*, 1997 U.S. Dist. LEXIS 14386, at *7-8.

### 3.  Extent To Which the Suit Has Progressed

Although Silver's motion for voluntarily dismissal was not filed on the eve of trial, this case is nearly a year old and has generated a number of motions, including a preliminary injunction motion and dispositive motions, and Lavandeira has expended significant resources defending against Silver's claims.  (*See* Def. Opp., at 11 (reporting that Lavandeira had incurred

$160,259.76 in legal fees as of the time his brief was filed).)  Moreover, in briefing Silver's preliminary judgment motion, the parties briefed the merits of Silver's claims and submitted evidence to the Court, in the form of printouts of the disputed blog entries, constituting several dozen reams of paper.  Finally, the timing of Silver's motion suggests that it may have been filed, at least in part, for the purpose of avoiding an adverse decision on Lavandiera's dispositive motion.  For these reasons, this factor – the extent to which the suit has progressed – weighs against voluntary dismissal of this action.  *See Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F. Supp. 2d 569, 572 (S.D.N.Y. 2004) (denying plaintiff's motion for voluntary dismissal where defendant had spent $20,000 in legal fees, reasoning that "a party should not be permitted to avoid the prospect of an adverse decision on a dispositive motion by dismissing a claim without prejudice"); *see also Jewelers Vigilance Comm.*, 1997 U.S. Dist. LEXIS 14386, at *8-9 (denying motion for voluntary dismissal, even though case was not on the eve of trial, where "Defendants [had] exhausted considerable effort in litigating [the] case").

### 4.    **Duplicative Expense of Relitigation**

Silver suggests that the issues in this case could all be litigated in Case II, thereby saving the parties (and the Court) from having to be embroiled in two separate actions.  Yet, although there is some overlap between the two cases, Plaintiff has not asserted most of her claims in the instant action – including her claims of misappropriation of "hot news," copyright infringement, and violation of the DMCA, the Lanham Act, and antitrust law – as counterclaims in Case II.  Thus, in order to litigate her claims in that case, Silver would need to amend her Answer to assert new counterclaims, which would have the effect of forcing Lavandeira to file yet another revised motion.

Lavandeira has already moved, in Case I, to dismiss Silver's claims, and he has already

moved in Case II to strike her existing counterclaims.  If Silver were now to withdraw her claims

in this case and add them as new counterclaims in the other case, Lavandeira would have to

abandon both existing motions and rework his motion to strike, so as to make it applicable to

Silver's amended pleading.  This would be unnecessarily duplicative and costly.  Accordingly,

this factor weighs against voluntary dismissal.

### 5.      Adequacy of Plaintiff's Explanation of the Need to Dismiss

Silver's stated explanation of the need for voluntary dismissal is that dismissal "will

simplify these proceedings, [and] reduce the burden on the Court and the cost to all parties."

(Pl. Mtn., at ¶ 6.)  As already noted, however, the actual impact of a voluntary dismissal without

prejudice is that already-briefed, dispositive motions in both of the two cases at issue would go

undecided, as Silver would presumably seek to amend her pleading in Case II to incorporate her

withdrawn claims from Case I.  For this reason, such an amendment, rather than simplify the

proceedings, would add unnecessary additional steps and delay resolution of the pending

motions on their merits.

Further, it appears to the Court that Silver's primary motivation in seeking to litigate her

claims in Case II instead of Case I is that she wishes to circumvent the discovery stay that the

Court has imposed and repeatedly confirmed in Case I.  (*See* Letter to the Court from Elizabeth

Silver, dated Mar. 3, 2009, at 1-2 ("It is [Silver's] understanding that . . . through [Case II,] all

issues between Mr. Lavandeira and [Silver] will be subjected to disclosures and discovery."); *id*.

at 2 (Silver "really do[es] not care [in what context her claims are adjudicated] as long the issues

are heard after there has been complete discovery."); *id*. at 2-3 (Because "Lavandeira sued

14

[Silver] and discovery is starting in [Case II,] it makes sense to voluntarily dismiss [Case I] and address all issues in the context of [Case II].”); *see also* Endorsed Letter to the Court from Elizabeth Silver, dated Aug. 18, 2008, filed Aug. 19, 2008 (Dkt. 10), at 2 (noting stay of discovery in Case I); Endorsed Letter to the Court from Elizabeth Silver, dated Aug. 21, 2008, filed Aug. 27, 2008 (Dkt. 11), at 2 (same); 2/24/09 Tr., at 7 (same).)  At the time Silver's voluntary dismissal motion was filed, discovery had not yet been stayed in Case II, and Silver apparently thought that, if she merely asserted her claims in Case II, instead of Case I, she could make an "end run" around the Court's prior case management orders.  In any event, regardless of whether Silver's desire for discovery might have been an appropriate basis for seeking a voluntary dismissal of Case I, the issue has now been mooted by this Court's subsequent order to stay discovery in Case II, in light of the newly filed dispositive motions in that case and the injunction issued against Silver in the California case.  (*See* 4/21/09 Tr., at 30-38, 45, 55 (discussing discovery stay in Case II).)

As the relevant factors, taken together, weigh against permitting Silver to withdraw her claims voluntarily without prejudice, I recommend that her motion for voluntary dismissal (Dkt. 82) be denied.  I further recommend that the Court proceed to consider Defendants' motion to dismiss Silver's Second Amended Complaint or, alternatively, for summary judgment in his favor.

## II.   DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT

### A.   Applicable Legal Standards

#### 1.   Rule 12(b)(6)

A case is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure where the complaint is not legally sufficient to state a claim upon which relief can be granted. *See Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991). In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997). Further, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority); *see also Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers).[5]

At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire*, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). In addition, even plaintiffs

---

[5] In this case, Defendants have complained at length that Plaintiff has received assistance from an attorney (*see* Letter to the Court from Jeffrey M. Eilender, dated Nov. 5, 2008), and Plaintiff has admitted to receiving some legal assistance, although not in the actual drafting of her pleadings and other submissions (*see* transcript of conference before the Court on Nov. 7, 2009, at 9-10). Because the extent of the legal assistance received by Plaintiff is unclear, the Court will give her Second Amended Complaint the benefit of a liberal construction.

who are proceeding *pro se* must comply with any relevant procedural and substantive rules and, to survive a motion to dismiss, a *pro se* complaint, like any other complaint, "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416, 2008 U.S. App. LEXIS 23977, at *2 (2d Cir. Nov. 20, 2008) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).

## 2.   <u>Rule 56</u>

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), *i.e.*, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998). In reviewing a summary judgment motion, the Court must view the record in the light most favorable to the non-movant by resolving all ambiguities and drawing all reasonable inferences in favor of that party. *Matsushita*, 475 U.S. at 587-88; *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir. 1995). But "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant offers no evidentiary support for an essential element on which it bears the burden of proof, summary judgment is warranted. *Id.* at 322-23; *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022 (2d Cir.

17

1991); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)

("In moving for summary judgment against a party who will bear the ultimate burden of proof at

trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an

essential element of the nonmoving party's claim.").

     Further, Fed. R. Civ. P. 56(e)(2) states that:

> When a motion for summary judgment is properly made and supported,
> an opposing party may not rely merely on allegations or denials in its
> own pleading; rather, its response must – by affidavits or as otherwise
> provided in this rule – set out specific facts showing a genuine issue for
> trial.  If the opposing party does not so respond, summary judgment
> should, if appropriate, be entered against that party.

Accordingly, a plaintiff opposing summary judgment may not rely on the allegations of a

complaint to defeat the motion.  *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996).  Where the

moving party fails to make and support its motion as provided for by Rule 56, however, the Rule

"does not impose on the party opposing summary judgment an obligation to come forward with

affidavits or other admissible evidence of his own."  *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d

Cir. 2000).

     Where, as here, a party has failed to make a timely submission of papers in opposition to

a summary judgment motion, the motion should not simply be granted by default.  *See Vermont*

*Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (even when a

motion for summary judgment is unopposed, "the district court must still assess whether the

moving party has fulfilled its burden of demonstrating that there is no genuine issue of material

fact and its entitlement to judgment as a matter of law"); *Amaker v. Foley,* 274 F.3d 677 (2d Cir.

2001) (same); *see also Champion*, 76 F.3d at 486.  It is true that, under the rules of this Court, a

party moving for summary judgment must submit a "statement of the material facts as to which

18

the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and, if the opposing party fails to controvert those facts in a responsive statement, then the material facts contained in the moving party's statement will be deemed admitted as a matter of law, *see Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see also* Local Civ. R. 56.1(c). Nonetheless, in determining whether the movant has met its burden of showing the absence of a genuine issue of fact, the Court may not simply accept its statement of undisputed facts. *Vermont Teddy Bear Co.*, 373 F.3d at 244. Rather, the movant's factual statements may only be deemed admitted if supported by the record. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001); *Zerafa v. Montefiore Hosp. Hous. Co.*, No. 05 Civ. 2718 (WCC), 2005 U.S. Dist. LEXIS 32139, at *21 (S.D.N.Y. Dec. 7, 2005). Summary judgment may then be granted, if the Court is satisfied that the undisputed facts "show that the moving party is entitled to a judgment as a matter of law." *Champion*, 76 F.3d at 486, quoting Fed. R. Civ. P. 56(c).

## B.    Defendants' Motion

As a threshold matter, Defendants argue that their motion should be granted on default because Silver failed to oppose it by the deadline set by the Court. (*See* Def. Opp., at 8 (citing *Singh v. New York City Dep't of Corrections*, No. 93 Civ. 6204 (PKL), 1995 U.S. Dist. LEXIS 18322 (S.D.N.Y. Dec. 11, 1995)).) Given Silver's *pro se* status, however, as well as this Court's preference against deciding cases on the basis of default, *see Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001), this Court declines to recommend that the Second Amended Complaint be dismissed simply because Silver has defaulted in opposing Defendants' Rule 12(b)(6) motion. Accordingly, the Court has considered the strongest possible arguments suggested by Silver's pleading, construing it liberally in her favor. Further, as the Court may

19

consider the supplemental submissions of a *pro se* plaintiff to amplify the allegations contained

in a pleading, *see Burgess v. Goord*, No. 98 Civ. 2077, 1999 U.S. Dist. LEXIS 611, at *1 n.1

(S.D.N.Y. Jan. 26, 1999), the Court has also considered any factual allegations contained in the

declaration filed by Plaintiff in support of her motion for voluntary dismissal, construing these

allegations liberally in her favor as well.

Moreover, as the Court may not grant an unopposed summary judgment motion without

first considering whether the movant is entitled to judgment as a matter of law, *see*

*Vermont Teddy Bear Co.*, 373 F.3d at 242, the Court has searched the available evidentiary

record in evaluating Defendants' alternative motion for summary judgment, to the extent this

case is not susceptible to dismissal on the face of Plaintiff's pleading.  In this regard, where the

Court has found it appropriate to look beyond the pleading, the Court has considered not only the

evidence submitted by Defendants, but also the evidence made a part of the record in this case by

Silver in connection with her earlier motion for a preliminary injunction.  Even affording Silver

the benefit of every reasonable inference, however, her claims cannot survive under Rule

12(b)(6) or, alternatively, under Rule 56.

As discussed further below, I recommend that the majority of Silver's claims be

dismissed under Rule 12(b)(6) for failure to state a claim, and that Defendants be granted

summary judgment on her claim for misappropriation of "hot news."

    1.    <u>**Plaintiff's Federal Claims**</u>

        a.    **Copyright Infringement and**
                <u>**Digital Millennium Copyright Act Claims**</u>

This Court previously reviewed the copyright claims raised by Silver in her Second

Amended Complaint, and recommended that her application for a preliminary injunction be

denied.  (*See* 1/7/09 Report & Recommendation.)  That recommendation was principally based on the fact that Silver had not demonstrated that she was likely to succeed on the merits of her claims.  (*See generally id*.)  Upon further review of Silver's allegations of copyright infringement in her Second Amended Complaint, this Court finds that Silver has failed to state a claim for relief that is plausible on its face.

As explained in this Court's prior recommendation (*id*. at 6), in order to plead a claim of copyright infringement adequately, a plaintiff must not only allege a validly held copyright, but must also allege facts sufficient to show that the defendant has copied *protectable* elements of the plaintiff's original work (*id*. (citing *Boone v. Jackson*, 206 Fed. Appx. 30, 31 (2d Cir. 2006)). This, in turn, requires allegations of both (1) actual copying, (which a plaintiff may establish by demonstrating "probative similarity" combined with "access"), and (2) illegal copying (which requires "substantial similarity" between protectable elements of the plaintiff's work and the defendant's).  (*Id*.)

In this case, Silver has alleged that she holds valid copyrights in her website and "all of the content on or posted on the website."  (2d Am. Compl., at ¶ 124.)  Silver alleges that "Lavandeira/Lava stole, copied, misappropriated and/or used without authorization Plaintiff's works, materials and/or hot news items."  (*Id*., at ¶ 98.)  In particular, Silver alleges that Lavandeira/Lava infringed Silver's copyrights in 149 of her blog posts by "unlawfully reproducing, transmitting, and displaying . . . substantial portions of the expressions contained within."  (*Id*., at ¶¶ 126-127.)  Silver further alleges that Lavandeira/Lava "caused [Silver's copyrighted blog posts] to be published in sequential order on Defendant Lavandeira/Lava's website."  (*Id*., at ¶ 98.)  In support of these allegations, Silver has attached a chart to her Second

Amended Complaint, listing, for each blog post alleged to have been copied, the subject of the post, the date and time posted on perezrevenge.com (Silver's website), and the date and time posted on perezhilton.com (Lavandeira's website).  (*Id.*, at Ex. 1.)

In addition, Silver has set out some of her factual allegations in greater detail in the declaration she filed in support of her voluntary dismissal motion.  (*See generally* Plaintiff Silver's Declaration in Support of Motion for Voluntary Dismissal Without Prejudice Pursuant to FRCP 42(a)(2), dated Mar. 3, 2009 ("Silver Decl."), attached to Pl. Mtn. (Dkt. 82).) Specifically, Silver alleges that, beginning in August 2008, Lavandeira began logging into Silver's website and copying the posts.  (Silver Decl., at ¶ 22.)  Silver also alleges that "Lavandeira simply looks at the perezrevenge.com website and uses it as a news service or feed service."  (*Id.*, at ¶ 31.)  According to Silver, Lavandeira's blog posts "have the same information, and facts, sometimes organized the same way, always the same subject matter, [and] sometimes the same photos" as Silver's blog posts.  (*Id.*, at ¶ 40.)  Attached to Silver's declaration is another chart, this one comparing the individual sentences of certain of Silver's blog posts with certain of Lavandeira's blog posts on similar subjects.  (*See id.*, at Ex. 1.)

Even accepting as true, as this Court does for purposes of this motion, that Silver owns validly held copyrights in her blog posts and that Lavandeira has logged on to Silver's website (thereby establishing access), Silver has not stated a plausible claim of copyright infringement upon which relief may be granted, as she has not alleged facts capable of showing "illegal copying."

In particular, as discussed in the Court's report on Silver's preliminary injunction motion, the web postings of Defendants that Plaintiff claims were copied from her do not, as a matter of

law, reflect any "substantial similarity" to hers, in terms of any original, protectable elements.

(*See* 1/7/09 Report and Recommendation, at 8.)

> In determining copyright infringement, 'the works themselves
> supersede and control contrary allegations and conclusions, or
> descriptions of the works as contained in the pleadings.'  If after
> examining the works themselves, this Court determines that there
> is no substantial similarity, then the plaintiff here can prove no
> facts in support of his claim which would entitle him to relief – the
> standard for dismissal under Rule 12(b)(6).

*Boyle v. Stephens, Inc.*, 1998 U.S. Dist. LEXIS 1968, at *11-12 (S.D.N.Y. Feb. 23, 1998)

(quoting *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985) (citation

omitted), *aff'd*, 784 F.2d 44 (2d Cir. 1986)).[6]

Here, upon examination of the works identified by Silver in her declaration (*see, e.g.*,

Silver Decl., at Ex. 1), this Court has concluded that any similarities between her and

Lavandeira's blog posts relate to unprotectable facts and ideas and not to Silver's particular

expression of those facts or ideas, *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,

499 U.S. 340, 350-51 (1991) (holding that facts are not subject to copyright protection).

---

[6] In *Boyle*, this Court considered whether a 12(b)(6) motion is the proper procedural
mechanism for evaluating substantial similarity.  *Boyle*, 1998 U.S. Dist. LEXIS 1968, at *9-12.
The Court determined that a copyright infringement claim may be dismissed "on a 12(b) motion
'if [the Court] concludes that no reasonable jury could find that the two works are substantially
similar, or if it concludes that the similarities between the two works pertain only to unprotected
elements of the works.'" *Id*., at *12 (quoting *Boyle v. Stephens, Inc.*, No. 97 Civ. 1351 (SAS),
1997 U.S. Dist. LEXIS 12780 (S.D.N.Y. Aug. 26, 1997)), *aff'd*, 21 Fed. Appx. 76 (2d Cir.
2001); *see also Adams v. Warner Bros. Pictures*, 289 Fed. Appx. 456, 457 (2d Cir. 2008)
(affirming dismissal where "[t]he complaint . . . contain[ed] no allegations describing the
similarities between [plaintiff's] and defendants' works," and concluding, "as a matter of law,
that no substantial similarities would be identified by a lay observer") (internal quotations
omitted).

For example, Silver has asked the Court to compare posts written by Silver and Lavandeira covering an interview that actor George Hamilton gave on the television show "The View," concerning his sexual relationship with his stepmother.  (*See* Silver Decl., Ex. 1, at ¶ 4 (citing Lavandeira Decl., Ex. A, at Tab 67).)  Silver's post, entitled, "George Hamilton talks about the affair he had with his stepmother," was posted at 9:20 a.m. on Friday, October 17, 2008, mentions Mr. Hamilton's newly released memoirs, and consists mostly of direct quotations of his remarks during the interview.  (*See* Lavandeira Decl., Ex. A, at Tab 67.)[7]

Lavandeira's post, entitled, "Wrong!!! Tanorexic George Hamilton Eff'd His Stepmom!," was posted at 12:15 p.m. on the same day, and also consists mostly of direct quotations from the interview, but Lavandeira does not mention the memoirs at all, adopts a harshly judgmental tone, and pokes fun at George Hamilton for being "leathery" and overly tan.  (*See id.*)[8]

---

[7] More specifically, Silver's post reads:  "Actor George Hamilton opened up on The View yesterday about the sexual affair he had with his stepmother when he was 12.  The 69 year old star reveals this and so much more in his new book, Don't Mind If I Do: A Memoir.  George says, '*When I was very young, 12, I had a relationship with my stepmother – not of kin and not of blood.  I always liked older women.  She was about 28.  My father never knew.*'  Remembering how the pair rekindled their affair years later, he adds: '*It was a very strange thing but it was normal.  She didn't make me feel bad about it . . . It went on for a short period of time.  Then, strangely enough, when I was of age, when I was an actor in Hollywood, I met her against and we had a follow-up . . . It didn't feel abnormal at the age of 12 – it was called cuddling, and I cuddled.*'"  (Lavandeira Decl., Ex. A, at Tab 67 (emphasis in original).)

[8] Lavandiera's post reads as follows:  "It's TRUE!  Leathery actor George Hamilton revealed in an interview with *The View* ladies on Thursday that at the age of 12, he slept with his stepmother:  'When I was very young, 12, I had a relationship with my stepmother.  Yeah.  She was about 28, 30.  It was very normal.' The crazy thing is how super nonchalant he was about it all!  He said he didn't see it as 'abuse' because it didn't 'warp' him:  'The bottom line is it didn't feel abnormal.  From my point of view it wasn't something so crazy – I don't think it warped me in my life.  The special relationship went on for a brief period of time, when I was 12, and then strangely enough when I was of age and I was an actor in Hollywood I met her again, she was as beautiful, and we had a sort of follow up.'  The king of tan also admitted that his dad passed

The similarities between two posts go no further than their subject matter – the facts surrounding George Hamilton's affair – and the direct quotations of George Hamilton's remarks from the interview, which are not protectable as Silver's original work.  *Feist Publ'ns*, 499 U.S. at 345 ("To qualify for copyright protection, a work must be original to the author.").  Further, although the underlying facts are the same, the particular expressions of those facts are not substantially similar.  *See, e.g., Bell v. Blaze Magazine*, No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783, at *13 (S.D.N.Y. Mar. 15, 2001) ("Even assuming as true Plaintiff's allegation that Defendants took his ideas for these articles and restructured them in a paraphrasing manner, again, this merely demonstrates that Defendants used Plaintiff's ideas or concepts and therefore cannot give rise to a violation of the copyright laws.").

Next, Silver asks the Court to compare posts written by Silver and Lavandeira covering the relocation of actor Brad Pitt and actress Angelina Jolie to Germany.  (*See* Silver Decl., Ex. 1, at ¶ 5 (the first of two paragraphs both numbered "5") (citing Lavandeira Decl., Ex. A, at Tab 18).)  Silver's post, entitled "Brad Pitt and Angelina Jolie have moved to Germany . . .," was posted at 9:34 a.m. on September 25, 2008, and discussed the fact of the move, the reason for the move (Mr. Pitt's new film), the fact that the family was "still together," the features of their rental property in Germany, and whether their bodyguards would be able to "keep the paparazzi at bay."  (Lavandeira Decl., Ex. A, at Tab 18.)[9]  Lavandeira's post, entitled "Wanna see

away in the middle of his rekindled affair with stepmommy.  Hmmm.  Wonder if daddy was driven to his grave by the realization that his son was effing his former wife?!!  So, so, so wrong!!!"  (Lavandeira Decl., Ex. A, at 11 and Tab 67.)

   [9] "Brad Pitt and Angelina Jolie, still together and obviously doing just fine, left their French estate, Chateau Miraval for Germany, where Brad is due to film 'Inglorious Bastards,' a World War II film by Quentin Tarantino.  Brad and Angelina packed up their six children and left France on Tuesday, landing in Berlin's Tempelhof airport.  The family will be staying in

Wannsee?" was posted at 11:15 a.m. on October 13, 2008, and discussed the fact of the move, the reason for the move, the features of the rental property, the price, and the names of other celebrities who have stayed there, and commented that "[a]ll that the historic Berlin villa is missing is a moat, draw bridge and portcullis!"  (*Id.*)[10]  The only similarities between the two posts are their underlying facts, and, again, the particular expressions of those facts are not substantially similar.

To take yet a third example, Silver has alleged copyright infringement with respect to two posts reporting on actress Victoria Beckham's lawsuit against the British magazine, *NOW*. (*See* Silver Decl., Ex. 1, at ¶ 5 (the second of two paragraphs both numbered "5") (citing Lavandeira Decl., Ex. A, at Tab 4).)  Both posts report on the fact of the lawsuit, the basis of the lawsuit, and quote Ms. Beckham's agent's public comment.  (Lavandeira Decl., Ex. A, at Tab 4.) None of these facts, however, is original to Silver, and therefore none constitutes a copyrightable element.

---

Germany for about 90 days at the rented villa which is south of the capital city.  The Palais Parkscloss is approximately 30,000 square feet and sits on Wannsee Lake.  It has all the amenities of 'home,' a private helicopter landing pad, a dock and a full security system equipped with a staff of 14 bodyguards.  We will see if these bodyguards can keep the paparazzi at bay!" (Lavandeira Decl., Ex. A, at Tab 18.)

[10] "We told you last week that the jet-setting Brangelina brood was planning a relocation to Berlin to join Super Dad Brad, where he's working on his latest project, Quentin Tarantino's *Inglorious Bastards*.  Well, now the Angie has landed and holed the flock up in a fortress-like villa on charming Wannsee Lake in Berlin.  The $40,000 a month sprawling property boasts 30,000 square feet, a boat dock, a private chef, and a helicopter pad and has hosted other celebrities such as Tom Cruise and Steven Seagal.  All that the historic Berlin villa is missing is a moat, draw bridge and portcullis!"  (Lavandeira Decl., Ex. A, at Tab 18.)

This Court has examined the remainder the contested posts and, as with the examples set forth above, has found no substantial similarities between any original, protectable elements of Silver's posts and Lavandeira's posts on the same subjects.  Accordingly, I recommend that Silver's copyright infringement claims be dismissed.

Further, as also discussed in this Court's prior Report and Recommendation, Silver has not alleged that Lavandeira engaged in the removal or alteration of copyright information in contravention of any digital copyright management system, as would be necessary for her to state a claim for relief under the Digital Millennium Copyright Act (the "DMCA").  (*See* 1/7/09 Report & Recommendation, at 2-4.)  For this reason, I also recommend that any claims brought by Silver under the DMCA be dismissed under Rule 12(b)(6).

### b.   Lanham Act

Silver asserts a claim for false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a).  The relevant statutory provision states:

> (1) Any person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  As distinguished from copyright law, the Lanham Act "was designed to protect only 'tangible goods' and not 'any idea, concept or communication embodied in [such goods].'"  *Hudson v. Universal Studios, Inc.*, No. 04 Civ. 6997, 2008 U.S. Dist. LEXIS 86146, at

*21-22 (S.D.N.Y. Oct. 23, 2008) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003)).

Accepting, for purposes of this motion, that the facts alleged by Silver are true, then Lavandeira's works are "copied or rewritten from [Silver] and other third-party news reports published on the [I]nternet." (2d Am. Compl., at ¶ 152.)  This allegation, however, does not state a claim for a Lanham Act violation, as creative works are, by definition, not considered to be tangible goods for purposes of the Lanham Act. *Hudson*, 2008 U.S. Dist. LEXIS 86146, at *22 (internal quotation and citation omitted) ("Lanham Act claims arising from the alleged copying of creative work have been clearly foreclosed.")  Thus, Silver has not stated a plausible claim under the Lanham Act, and I recommend that her claim be dismissed. *See Atrium Group de Ediciones y Publicaciones, S.L. v. Harry N. Abrams, Inc.*, 565 F. Supp. 2d 505, 511 (S.D.N.Y. 2008) (granting motion to dismiss "because Plaintiffs' Lanham Act claim is no more than a claim of copyright infringement dressed up in the guise of the Lanham Act").

### c.      Sherman Act

Plaintiff alleges that, as the result of an agreement between defendants Lavandeira and Copeland, Copeland and, by extension, Pressflex and Blogads, have refused to enter into an advertising contract with her (2d Am. Compl., at ¶ 44), and have "attempted to restrict [her] advertising or competing in [the celebrity news market]" (*id.*, at ¶¶ 40, 146).

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." In order to state a claim under Section 1, a plaintiff must allege: "'(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) [that]

such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason.'" *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 288 (S.D.N.Y. 2007) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998)).

Plaintiff has failed to state a claim for violation of Section 1 of the Sherman Act upon which relief may be granted, as, for the reasons discussed below, she has not alleged any conduct that could have constituted a restraint of trade that was either unreasonable *per se* or under the rule of reason.

### i.     *Per Se* Unreasonable Restraints of Trade

A "'small class of actions'" have been deemed by the courts to have "'such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit,'" so as to be considered "'unreasonable *per se*.'" *Wellnx*, 516 F. Supp. 2d at 289 (quoting *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (internal quotations and citation omitted)). "Group boycotts, or concerted refusals to deal with other traders" are held to be *per se* unreasonable. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). The Supreme Court has limited this rule, however, to cases involving "horizontal agreements," and has held that a "'vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels.'" *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) (*quoting Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735-36 (1988)).[11]

---

[11] "'Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.'" *Wellnx Life Scis., Inc.*, 516 F. Supp. 2d at 290 n.5 (quoting *E & L Consulting*, 472 F.3d at 29 n.4).

Here, Silver has alleged no horizontal restraint of trade, as defendants Lavandeira and Copeland/Pressflex/Blogads are not competitors.  Rather, as Silver concedes, Pressflex is a provider of servers and bandwidth to Lavandeira (2d Am. Compl., at ¶ 10), and Blogads is a seller of advertising on Lavandeira's blog (2d Am. Compl., at ¶¶ 12-13).  Moreover, based on the allegations of Plaintiff's own pleading, Pressflex and Blogads are both owned by Copeland, and thus, under principles of antitrust law, they are not considered legally distinct economic entities, capable of entering into a horizontal restraint of trade.  *See Wellnx*, 516 F. Supp. 2d at 288-89 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)).  As Silver has not alleged a horizontal restraint, nor any other restraint of trade of "pernicious anticompetitive effect," she has failed to allege that defendants engaged in a restraint of trade that was *per se* unreasonable.

### ii.     Restraints of Trade Under the Rule of Reason

Under the "rule of reason" analysis, courts look to whether the anticompetitive effects of a restraint of trade outweigh its procompetitive effects.  *E & L Consulting*, 472 F.3d at 29.  The plaintiff bears the initial burden to demonstrate some anticompetitive effect of the defendant's conduct.  In particular, the plaintiff must show that the "defendant[']s challenged behavior had an actual adverse effect on competition as a whole in the relevant market."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (internal quotations omitted).  "Because the antitrust laws protect competition as a whole, evidence that [a] plaintiff[] ha[s] been harmed as [an] individual competitor[] will not suffice."  *Id*. at 507.  "A complaint alleging a Section 1 violation under the rule of reason must contain facts sufficient to render the claim of harm to competition plausible."  *Wellnx Life Scis., Inc.*, 516 F. Supp. 2d at 293 (citations omitted); *Elecs. Communs. Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240,

245 (2d Cir. 1997) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief can be granted.").

In this action, Silver has not alleged facts sufficient to render plausible any harm to market-wide competition.  (*See* 2d Am. Compl., at ¶¶ 142-150.)  Her allegation that her individual business has been adversely affected will not suffice.  *See Geneva Pharms. Tech. Corp.*, 386 F.3d at 507.  Further, her conclusory allegation that defendants "have contracted, and/or otherwise agreed to restraint of trade, commerce and competition of websites, such as Plaintiff's website perezrevenge.com, that compete in [the celebrity news market]" (*see* 2d Am. Compl., at ¶ 144) is, in itself, insufficient to allege an unreasonable restraint of trade, *see Wellnx*, 516 F. Supp. 2d at 293 (plaintiff's allegation that the "refusal to deal [by defendants] had the effect of unreasonably restraining trade in the sale of advertising space in bodybuilding publications" was held to be a "conclusory statement [] not supported by allegations of fact" where no allegation was made that defendants' agreement had "adversely effected price, output or quality of services in the overall market for advertising space").

Accordingly, Plaintiff has failed to state a claim for violation of Section 1, and I recommend that her Sherman Act claim be dismissed under Rule 12(b)(6).

### 2.        Pendent State Law Claims

When a district court dismisses a plaintiff's federal claims, it has discretion to retain supplemental jurisdiction over any pendent state law claims.  28 U.S.C. § 1367(c)(3).  The Court may choose to retain jurisdiction over pendent claims where significant judicial resources already have been expended by the Court in evaluating the claims, *see Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004), or if the outcome of the claims is plain, *see Waterman v. Transport Workers' Union Local 100*, 8 F. Supp. 2d 363, 369 n.2 (S.D.N.Y. 1998).  In the

circumstances presented here, where the Court is already familiar with Silver's state law claims, having evaluated them in the context of her preliminary injunction motion, and where the claims plainly lack merit, I recommend that the Court retain jurisdiction over them, and proceed to address them.

### a.  Unfair Competition Under New York Common Law

Silver's unfair competition claim is based on Lavandeira's copying or paraphrasing of Plaintiff's stories and passing them off as a product of his own reporting.  (2d Am. Compl., at ¶ 152.)  As this claim contains "no element to qualitatively differentiate it from those areas protected by copyright," *Kregos v. Assoc. Press*, 3 F.3d 656, 666 (2d Cir. 1993), it is preempted by Section 301 of the Copyright Act, *see Integrative Nutrition, Inc. v. Acad. of Healing Nutrition*, 476 F. Supp. 2d 291, 298 (S.D.N.Y. 2007) (New York unfair competition claim preempted where claim concerned copying of website and brochure content).  For this reason, the claim should be dismissed.  *Id*.

### b.  "Hot News" Misappropriation

Under New York law, the elements of a claim for misappropriation of "hot news" are that "(i) the plaintiff generates or collects information at some cost or expense; (ii) the value of the information is highly time-sensitive; (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it; (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff; [and] (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997).

In its January 7, 2009 Report and Recommendation, this Court determined that Silver had failed to show likelihood of success on the merits of this claim because, *inter alia*, the same information that was allegedly gathered by Plaintiff through costly efforts was widely available and published by numerous other sources on the Internet, generally before it was published by Plaintiff.  (*See* 1/7/09 Report and Recommendation, at 9-10 (citing Declaration of Barbara Lavandeira, dated Dec. 23, 2008 ("Barbara Lavandeira Decl.") (Dkt. 56), at ¶¶ 46-52, and attached chart (Ex. A)).)  As a result, this Court reasoned, Silver would be unlikely to be able to prove that she incurred significant costs in gathering the information or that Lavandeira in fact copied the information from her, as opposed to from any of the numerous other sources available to him.  (*Id.*)

Upon review of the motion that is now before this Court, the Court finds that, although Silver has stated a "hot news" misappropriation claim that is plausible on its face, and would thus survive a motion to dismiss, she indeed has failed to raise a triable issue of fact as to whether Lavandeira engaged in free-riding on her costly efforts.  Accordingly, I recommend that summary judgment be granted to Defendants with respect to Silver's "hot news" misappropriation claim.

### i.   Adequacy of Plaintiff's Pleading of Her "Hot-News" Misappropriation Claim

Silver has alleged that she "collects and gathers newsworthy information, creates and edits [her] news reports and transmits [her] news reports at substantial economic, professional and personal cost."  (*See* Second Am. Compl., at ¶¶ 28, 112.)  In particular, Silver has alleged that she incurs costs by engaging in time-consuming reporting (*id.*, at ¶¶ 30, 36), by paying for subscription-based news feeds (*id.*, at ¶¶ 29), and by paying an employee to cull through the

news published on those feeds, in order to select stories to post on her own blog (Silver Decl., at ¶ 41).  Construing her pleading liberally, as supplemented by this last allegation (added by Silver in her declaration in support of her voluntary dismissal motion), this Court finds that Silver has sufficiently pleaded the first element of a hot news misappropriation claim, *i.e.*, that she "generates or collects information at some cost or expense."  *Nat'l Basketball Ass'n,* 105 F.3d at 852.

Silver further alleges that the sole source of income for her website is advertising, and that the revenue earned by her website depends on the amount of traffic it generates.  (*See* Second Am. Compl., at ¶¶ 23-24.)  Silver pleads that she seeks to gather and post "hot news" stories before they are posted by any other celebrity gossip website (*see id.*, at ¶ 73-74), in order to gain readership and increase the traffic to her website, thereby increasing her advertising revenue.  Accordingly, Silver alleges, the value of the information that she reports is highly time-sensitive (*see id.*, at ¶ 113) – the second element necessary to her claim.

As for the remaining three elements necessary to state a hot news misappropriation claim, Silver alleges that Lavandeira/Lava copies information from her website (*see id.*, at ¶¶ 56, 95), and that by copying her posts instead of researching the underlying information himself, Lavandeira/Lava saves time and money, and thereby "free rides" on Silver's efforts, reaping advertising revenue he has not earned (*see id.*, at ¶¶ 65-66, 100, 114).  Silver also alleges that Lavandeira/Lava's "celebrity news service" is targeted to the same customer base as her own, and therefore directly competes with Plaintiff's "celebrity news service."  (*Id.*, at 115-16.)  Finally, Silver alleges that, as a result of Lavandeira/Lava's copying of her information, her website has suffered a decline in traffic (*see id.*, at ¶ 70), her incentives to produce "celebrity

news services" have been substantially reduced, and her website has been jeopardized (*see id.*, at ¶ 117).

Taking all of these allegations as true for the purposes of Defendants' motion to dismiss, this Court concludes that Silver has adequately alleged all five of the elements of a claim of "hot news" misappropriation under New York state law, such that her Second Amended Complaint, in this regard, can withstand Defendants' Rule 12(b)(6) motion. *See, e.g.*, *AP v. All Headline News Corp.*, No. 08 Civ. 323 (PKC), 2009 U.S. Dist. LEXIS 11816, at *4 (S.D.N.Y. Feb. 17, 2009).

### ii.    Lack of Genuine Issue of Material Fact  As To Defendants' Alleged "Free-Riding"

The evidence before the Court reflects, as Silver has alleged, that her blog and Lavandeira's blog often reported on similar subject matter.  (Silver Decl. at Ex. 1.)  Many of the news items covered by Silver were covered by Lavandeira on the same day.  (*Id.*)  In some instances, Silver's blog posts occurred earlier in time than Lavandeira's posts on the same subjects, and occasionally, stories appeared on Lavandeira's blog only minutes after they appeared on Silver's blog.  (*Id.*)  Moreover, in connection with her motion for a preliminary injunction, Silver has provided documents purporting to show that, on numerous instances beginning in August 2008, Lavandeira or someone acting on his behalf logged onto Silver's website from IP addresses that were registered to Lavandeira.  (*See* Plaintiff's Declaration in Opposition to Defendant Lavandeira's Purported Witness & Exhibit List, dated Dec. 31, 2008 (Dkt. 59), at ¶¶ 29-34; Plaintiff's Reply Memorandum Submitted in Accordance With The

Court's Dec. 12, 2008 Scheduling Order in Further Support of Relief Sought at Upcoming

January 15, 2009 Hearing, dated Dec. 31, 2008 (Dkt. 62), at 4.)[12]

The evidence, however, does not demonstrate the existence of a triable issue of fact with

respect to whether Lavandeira engaged in free-riding with respect to any of the challenged news

items.  First, Lavandeira has adequately demonstrated that the same news items that he and

Silver each reported were also reported by numerous other gossip bloggers and celebrity news

publications, often before they were posted on Silver's blog.  (*See* Def. 56.1 Stmt., at ¶ 2.)  Thus,

the mere fact that Lavandeira may have viewed Silver's blog and reported on similar news items

does not raise an inference that Lavandeira appropriated the items from Silver.  Indeed, through

a declaration of his sister, who works with him, Lavandeira has submitted evidence to show that

he had numerous other sources for his material (*see* Barbara Lavandeira Decl., at ¶¶ 20, 22-24,

49, 55, and Ex. A), and Plaintiff has failed to refute this evidence,[13] *cf. Financial Information,*

---

[12] Silver has submitted similar evidence in Case II.  (*See* Defendant/Counterclaimant Silver's Declaration in Opposition to Lavandeira's Motion and in Support of Her Cross Motion for Limited Jurisdictional and Other Discovery Related to Lavandeira's Motion and for Other Just and Equitable Relief, dated Mar. 13, 2009, at ¶¶ 29-79, and exhibits attached thereto.) (Dkt. 23 in Case II.)

[13] In the context of her motion for voluntary dismissal, Silver challenges the credibility of Lavandeira's sister with respect to her statements as to the sources of Lavandeira's news reports. As an example, Silver contends that Lavandeira's sister misrepresented the source of the George Hamilton post, discussed *supra*, as the online version of the *Daily Mail*, a British newspaper (*see* Lavandeira Decl., Ex. A, at 11), as, according to Silver, the Daily Mail did not publish the story until *after* Lavandeira carried it on his blog (*see* Silver Decl., Ex. 1, at ¶ 4).  In support of her contention, Silver points to the date and time-stamp on Lavandeira's post (12:15 p.m. on October 17, 2008) and a supposedly later time-stamp on the *Daily Mail* post (10:09 p.m. on the same day).  The Court, however, finds no reason to disregard Lavandeira's submitted evidence on this point.  First, what Silver characterizes as a "time-stamp" on the *Daily Mail* piece is, in fact, labeled as the time when then webpage was "[l]ast updated."  (*See* Lavandeira Decl., Ex. A, at Tab 67.)  Second, Lavandeira has shown that another source, namely, the *Huffington Post*, published the story on October 16, the day before his post.  (Lavandeira Decl., Ex. A, at 11 and Tab 67.)  The Court has examined Silver's other credibility arguments and has found them similarly unpersuasive.

*Inc. v. Moody's Investors Service, Inc.*, 808 F.2d 204, 209 (2d Cir. 1986) (affirming judgment where, at trial, plaintiff "proved neither the quantity of copying nor the immediacy of distribution necessary to sustain a 'hot' news [misappropriation] claim").

Second, although Silver alleges that Lavandeira has engaged in free-riding on her costly efforts and has not spent time researching the news stories on his own (*see* 2d Am. Compl., at ¶¶ 59, 114), the record does not contain any evidence capable of establishing that Lavandeira did not, in fact, engage in costly efforts of his own.  On this point, the declaration of Lavandeira's sister sets forth the basic operational scheme of Lavandeira's business (which appears to this Court to be not remarkably different from that of Silver's business).  (*See* Barbara Lavandeira Decl., at ¶¶ 5, 10-13.)  This declaration reflects that Lavandeira employs a staff of three to cull through numerous websites, such as Yahoo, Google, and People.com, as well as press releases sent by agents of celebrities and venues, in order to select news items to post on his blog.  (*See id.*, at ¶ 10.)  Lavandeira's staff prepares an initial draft of the blog posts, which Lavandeira then edits.  (*Id.*, at ¶ 5.)

As the record does not suggest any triable issue of fact as to whether Lavandeira is free-riding on Silver's costly reporting efforts, I recommend that summary judgment be granted to Defendants with respect to this claim.  *See Nba v. Motorola*, 105 F.3d 841, 854 (2d Cir. 1997) (finding that plaintiff failed to establish free-riding where defendants "expend[ed] their own resources to collect purely factual information").

### c.   Tortious Interference, Negligence, and Harassment

Silver also asserts a number of other state law tort claims, including claims of tortious interference with business relations and negligence, as well as a purported claim for "harassment."  (2d Am. Compl., at ¶¶ 169-77.)

Under New York law, the elements of a claim for tortious interference with prospective business relations are:  "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship."  *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000).

In this case, Silver has alleged that Lavandeira has interfered with her negotiations with Copeland/Pressflex/Blogads to enter into an advertising agreement, and that, as a result of Lavandeira's interference, Copeland/Pressflex/Blogads has refused to deal with Silver.  (2d Am. Compl., at ¶¶ 40-46.)  She has also alleged, in reference to Lavandeira's trademark proceedings, that Lavandeira has attempted "to use litigation to interfere with Plaintiff's operation of her own website and the development of her own business" (2d Am. Compl., at ¶ 173), although she has not alleged any specific business relationship that was harmed as a result of Lavandeira's efforts to enforce his trademark rights.  Yet even if she has sufficiently pleaded "interference," Silver has not alleged facts sufficient to establish the third element of a tortious interference claim, as she has not alleged any means employed by defendants that were dishonest, unfair, or improper. *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 468 (S.D.N.Y. 2006) (noting that the third element of a tortious interference claim "has recently been refined by the New York Court of Appeals" such that the conduct "must amount to a crime or an independent tort"); *see also Leopold v. Henry I. Siegel Co.*, No. 86 Civ. 0063 (MGC), 1986 U.S. Dist. LEXIS 15874, at *9-10 (S.D.N.Y. Dec. 30, 1986) ("A trademark owner is entitled to advise others of his trademark rights, to warn others that they or others are or may be infringing his rights, to inform others that he is seeking to enforce his rights through legal proceedings, and to threaten accused infringers and their customers with suit.").

Nor has Silver sufficiently pleaded a negligence claim.  Under New York law, "[t]o establish a negligence cause of action, a plaintiff must demonstrate (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) that the breach is a proximate cause of plaintiff's injury or damages; and (4) that the plaintiff suffered a legally cognizable injury or damages."  *Sugarman v. Equinox Holdings, Inc.*, 2008 NY Slip Op 52530U, 4 (N.Y. Sup. Ct. 2008) (dismissing plaintiff's negligence claim).  Silver's operative complaint states that Silver is entitled to recover for the Defendants' "negligence," but does not contain allegations of any particular negligent actions or of any duty owed her by Defendants.  (*See* 2d Am. Compl., at 177.)  Moreover, as defendants point out, New York law does not recognize a cause of action for negligently suing a party.  (*See* Memorandum of Law in Support of Motion to Dismiss the Complaint or Alternatively for Summary Judgment, dated Jan. 9, 2009 (Dkt. 67), at 23 (citing *Coleman v. Corporate Loss Prevention Assocs.*, 724 N.Y.S.2d 321 (2d Dep't 2001) ("There is no cause of action in the State of New York sounding in negligent prosecution or investigation.")).)

Finally, the allegations pleaded by Silver cannot support a claim for harassment, as New York does not recognize any such cause of action.  *N.Y. Stock Exch., Inc. v. Gahary*, 196 F. Supp. 2d 401, 414 (S.D.N.Y. 2002) ("New York law does not recognize any independent tort for harassment.").

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Court grant Defendants' summary judgment motion with respect to Plaintiff's hot news misappropriation claim and grant Defendants' motion to dismiss under 12(b)(6) with respect to the remainder of Plaintiff's claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, United States Courthouse, 500 Pearl Street, Room 1340, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         July 15, 2009

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

40

Copies to:

The Honorable Jed S. Rakoff, U.S.D.J.

Ms. Elizabeth Silver
545 Eighth Avenue
Suite 401
New York, NY 10018

Jeffrey M. Eilender, Esq.
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004